Thank you, Judge Traxler, and may it please the Court, I'm Steve Goodwin, here on behalf of the appellant, CSX Transportation, Inc. This Court's no stranger to litigation under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, known as the 4R Act, which is now codified at 49 U.S.C., Section 11501. In one of the earliest decisions under this statute, in the Clinchfield case that we cite in our brief, this Court acknowledged that Congress set out to eliminate discriminatory taxation of railroads in passing this section of the 4R Act because, quoting, it is a fact widely known and recognized by Congress that property taxation by the several states has for many years operated in a fashion inherently discriminatory against the railroads. This case shows that the statement this Court made 34 years ago, despite that statement, this discrimination still exists. The Supreme Court, on more than one occasion, they've had, I think, five Section 306 cases. And on more than one occasion, they've said that this section, 11501, was directed and aimed at restoring the financial stability of the railway system in the United States. And toward that end, the courts have unerringly, until this Court, the lower court, have unerringly held that tax schemes which singled out railroads for discriminatory treatment, denying them tax benefits granted to other commercial industrial taxpayers, violates Section 11501B4. As a matter of fact, it is difficult to imagine a more discriminatory tax scheme to a railroad than limiting the taxable valuation of all other commercial industrial rail property, but not you, Mr. Railroad. Even though you're in the group of other disfavored taxpayers, every court has said that doesn't make any difference, because Congress meant to protect the railroads. This is exactly what South Carolina has done. And what do the cases say? And they're unanimous on this. And I won't go through all the facts, because I know you've read the briefs. What should the comparison group be for the railroads? Here it's commercial industrial taxpayers, because we're dealing with property subject to tax, real property subject to tax, which is the railroads comparison class here will be other commercial industrial taxpayers. And I don't think the District Court didn't find to the contrary and didn't rule on that, because this is an obvious comparison class. It's we own property, real property. Other businesses own real property. So that would be the comparison class in this case. So it's all businesses that own? All businesses that own real property. Does it matter, Mr. Goodwin, that I confess this tax scheme is a bit daunting to try to get through, but does it matter that it appears that on the front end the railroads seem to be getting some kind of an offset when the tax value is first imposed? It's not, Judge Diaz, and I'm glad you raised that, because I was going to wait until rebuttal, but let's talk about that right now, the 80% equalization. First of all, it's curious, because the Department of Revenue did not at trial really argue that, and because they know that the 80% equalization has nothing to do with the cap statute. The 80% came in in 1991 when South Carolina read the 4R Act and said, well, wait, some taxpayers have federal protection, the railroads, the airlines, and the trucking companies who also have their analog of Section 306. And we have to equalize their property under our state law. Now what problems did that bring up? Well, for one thing, one thing they had to address was their different assessment ratios for different types of property in South Carolina. For example, if you own commercial real property, you're actually assessed at only 6% of its value, but the legislature set 9.5% for railroads. Well, that's a problem, because already we're behind, because we're at 9.5% and commercial real property is at 6%. So they had to address that. We've got to adjust with that somehow. The second thing they had to adjust for back in 1991 is that local assessments of personal property weren't really coming up with fair market value. You had the Department of Revenue every year hitting it on the head of what the current fair market value was for railroad property. That was not happening to business personal property. So they came up with this 80%. The cap statute is 15 years later and has nothing to do with this case, with this statute. And there was absolutely no proof, no proof at trial that this is an adjustment to make up for the fact or an offset that we don't get the cap. So there was a complete failure of proof on that as being, well, we don't have to worry about giving you the cap because we're giving you the 80%. That addresses a different issue. As a matter of fact, there's proof in this record that that 80% may be wrong, may be too high, because South Carolina continues to invade its property tax base through a number of mechanisms. But that's a different case. We didn't raise that in this case. That's a different case. I hope we never have to bring that case. But that is a different issue, Judge Niels. But in Ogilvy, for example, North Dakota said we're going to exempt business personal property, but not the railroads and the usual cast of suspects, the other public utilities. Eighth Circuit said can't do that. In Huddleston, the Tenth Circuit had the Colorado case where if you're a business that owns computer software, it's exempt, but not you, railroad. You still have to pay tax on your computer software, and the solution there was simple. Treat the railroads the same way. If other businesses aren't paying on their computer software, neither should the railroads. And then the Bear case, which is probably the most, all fours of this case. What was Iowa doing? Iowa came along and said, business taxpayer, on your personal property, we're going to roll back the value to 1973. In other words, we're going to take inflation out of the picture. We're going to roll your value back to 1973 on your personal property and then give you credit against it, which would be ever escalating. But not for railroads. Not for other public utilities. They don't get this. And the Eighth Circuit said, yes, they do. And it's interesting because the railroad actually asked for a complete exemption for the tax. The Eighth Circuit said, no, that's not the answer. The answer is, we're going to tell Iowa to treat you the same way they treat other business taxpayers. And, therefore, you get the valuation rollback and you get the credit. It's interesting that the district court cites the Bear case, but doesn't try to distinguish it. The district court uses that mysterious CF. I've never really understood what CF means, except the court didn't go on to say, and here's why I think that the Bear case doesn't apply. I basically want to touch on two major flaws in the district court's opinion, other than its unexplained departure from precedent. Two flaws. Would you say that last part again? Other than this departure from precedent. There's two other, there are two major flaws which I think require this court to reverse this decision. First was the court's conclusion that was not advanced by the state and the department at the trial, wasn't argued or briefed by either party, but the conclusion that the South Carolina Real Property Evaluation Reform Act does not, quote, impose a tax, end quote, within the meaning of section B4. District court cites no relevant authority for that and could not, because here's what the precedent has established. A state may not deny a property tax benefit to railroads that it grants to non-utility commercial industrial taxpayers, and relief has never been denied by any decision that survived appellate review by any concept where there's no tax actually being imposed here. The state, to its credit, spends very little time in its brief trying to defend this notion, because, of course, they're imposing a tax. We wouldn't be here if we weren't having to pay a tax. That's why we're here. So the tax is being imposed. It's the property tax. So let's get to the real heart of the appeal. The real heart of this appeal is the second major flaw, which is, well, CSX, you're out of luck because you proceeded under the wrong provision of the act. Make no mistake about it. This is not a case about identifying and quantifying discrimination. We know what it is. We don't have to search for it. It is everybody else is getting a 15% cap, and we're not. And the state has never really seriously denied that the cap statute is discriminatory. I know they deny it in their answer, but they don't seriously deny that it's discriminatory. The district court didn't doubt that it was discriminatory. So this is not a case about how do we identify and quantify discrimination. It's about the remedy. Why do you say that the district court didn't doubt that it was discriminatory? Because the district court never said, oh, by the way, you lose because the tax is not discriminatory. The district court ruled, you lose because you're under the wrong provision of the act. That's why I say that. The district court, in effect, held that subsections B1, which is the assessment ratio part of the statute, and B4, the any other tax provision, are mutually exclusive remedies. Now, the district court cites no authority for that because there is no authority for that. No court's ever held that. But we do know from the president and from the language, the catch-all language, any other tax that discriminates against a railroad, we do know that B4 is precisely the avenue to challenge the scheme at issue here as it was in Ogilvie, Huddleston, and Bexar. And, in fact, the ACF case was a case brought under B4, went to the Supreme Court. So we know that these are not mutually exclusive remedies. B1 is applicable generally in cases such as the railroad claims that the department came up with the wrong total value for its property. It's not the issue here. Sometimes the B1 cases come up in the context of Quinchfield. The local assessors are not following their law in coming up with fair market values. B1 comes into effect. B4 applies when the railroads are singled out for a discriminatory treatment when it comes to tax benefits. And this is... Why doesn't B3 apply? B3 actually goes to tax rates, Judge Diaz. Isn't this essentially changing the tax rate? It could be. And I've had clients who say, why don't we argue this is a tax rate case? But I think what Congress meant by that is that, for example, we're talking about the mill levy. What the county comes up with is your tax rate. We're getting the same as everybody else. So this was not really a C case, although I guess you could theoretically structure a C case because we're actually paying at a higher rate because we have more property that's being taxed. But C, I think, goes to the mill levy and the tax rate, and it's the same for us as it is for all taxpayers in South Carolina. So that's why we didn't break it under C. Is there any part of bringing your case into more than one period under this statute? There's nothing wrong with doing that. The wonderful thing about Section 306 or 11501 is the courts have not allowed a discriminatory tax to escape the hangman under this statute. When the courts see it, they correct it. And none of these provisions are mutually exclusive. And that's really the rationale of the district court here. We know they are. And you've got to choose. It's like an election of remedies. And if you choose the wrong one, you're out. And that's simply not the way that the courts are construed. There's certainly some disadvantage to proceeding under B1 from your perspective. Well, there was. And this is in the record. Part of the problem with B1 and why nobody could bring up levels of assessment, nobody could bring up sales ratio studies, because South Carolina has abandoned the fair market value standard. That's basically what they've done. And I don't think they'll deny that. You're no longer valued at your fair market value because of the cap. That makes it very, very difficult to come up with a level of assessment that's consistent with a comparison with how the railroads are done. And plus, you've got to throw in the different assessment ratios. That complicates it greatly. Some properties at 6%. Some commercial properties at 10.5%. We're at 9.5%. How do you factor all that in? And as far as showing assessment ratio disparities, first of all, I commend Bayer to you because Bayer faced this issue. And because Iowa argued, hey, wait a minute, you can't give them relief unless we see some ratios. And the court said, no, that's not the kind of case this is. This is a case of a tax that is of a benefit that's denied to the railroad. It's easy to fix this one. Give them the same deal you give everybody else. But as far as using, for example, sales ratio studies, they don't use their own in the Department of Revenue anymore. And this is in the record. We had an exhibit, P43, found at JA391. It was a notice that Department of Revenue sent to the counties and said, we can't use our ratio studies anymore because they don't give us credible values. It's because of the cap. And then we had the testimony, the deposition testimony of Mr. Cleland, who testified, they don't use their sales ratio studies for any purpose. That's at JA62. So it's really disingenuous for the state to come in here and say, oh, well, they should have had our sales ratios. That's simply not this case. I'll save my time. Yeah, you've got some time for reply. Mr. Kempson. Thank you, and may it please the court. I am Milton Kempson on behalf of the South Carolina Department of Revenue and its former director, Rick Reams. With me at council table are Nicole Wooten and Parkin Hunter. It's our pleasure to be here and to represent the state of South Carolina. Your honors, we would respectfully ask this court to affirm the district court. District court essentially said, CSX Railroad, you tried your case under the wrong prong of the 4R Act. This is not a subsection B4 case. It's a subsection B1 case. And part of that must be with the understanding of how the state statute works. Essentially what the state statute does is to say, if their value increases over the five-year reassessment cycle in non-railroad real property, only 15% of that value increase will be taxed for the purposes of the property tax. What this essentially does is to suppress the tax-assessed value of property versus its fair market value, without so affecting or limiting the assessed value with the fair market value of railroad real property. What that does is to create an unequal assessment ratio. And that is exactly what B1 of the 4R Act is designed to address. This is what this case is about, and it's very simple. The court did not say at all that the South Carolina statute could not be addressed in the 4R Act. It simply said, CSX Railroad, you pled and tried your case solely under B4 of the 4R Act. You presented no evidence whatsoever on B1. Therefore, you must lose. You failed to prove your case. And we would respectfully ask this court to affirm the district court on those lines. It is interesting that over the course of time, CSX Railroad has argued that the Department of Revenue has tried to say a number of things. We have not tried to say that property taxes cannot be addressed under subsection B4. Certainly, we realize that it is cited in several cases, the Ogilvie line of cases, Huddleston, where B4, subsection B4 of the 4R Act, was used to address property taxes. But that's not this case. In those cases, Ogilvie and Huddleston, those were exemption cases. B1, B2, and B3 of the 4R Act do not apply to exemption cases. So that B4, subsection B4, was the only remedy available to the railroads in those cases. Here, they've got a remedy, B1. We assert that B1 and B4 are mutually exclusive. And we pointed to the language of the United States Supreme Court in the 2011 CSX versus Alabama case. Essentially, when discussing what subsection 4 means, another tax which discriminates against railroads, the court essentially said that B4 can address all kinds of taxation, except those taxation areas that are covered by B1, B2, and B3. That language has to mean something. The state of South Carolina asserts that it means that where B1 applies, B4 cannot apply. Now, the Department of Revenue acknowledges to this court that the South Carolina statute does have an effect on railroads. We're not here saying that it doesn't. What we are saying, however, is that the alleged discrimination should have been addressed under subsection B1 of the 4R Act. And we don't believe that if the case had been tried under B1, CSX railroad would have been able to show any discrimination. Subsection C of the 4R Act requires that there be at least, or that the ratio disparity exceed 5%. We do not believe that CSX railroad can show that. Now, they talk about the fact that their difficulties in proof. They've got the burden of proof. Just because their difficulties in proof, that does not obviate them from coming forward and trying their case. I would point this court to some of the courts that they have cited. In the Circuit Court opinion in Bayer, 1985, the Bayer court essentially says, you've got to show three things, four things. You've got to show the assessed value of railroad property versus its fair market value. Then you've got to show the assessed value of non-railroad property, other commercial and industrial property, versus its fair market value. In a district court opinion in Bayer, I believe that's a court decision. Yes, sir. Too far down the road there. Let me go back to the very beginning of your argument. So explain to me again how the cap, which is a limitation on increase in the fair market value of real property, is the same as assessing real property at a higher ratio. Those seem to be two different things. The ratio under Subsection B1 is to be determined by looking at the assessed value of non-railroad property versus its fair market value. So essentially what we do is divide the assessed value by the fair market value to create a ratio. Because we are essentially suppressing the assessed value of the non-railroad property, that ratio necessarily becomes small. When we look at the railroad property, we look at the assessed value of the railroad property. So is there somewhere in the regulatory scheme or some kind of public notice that provides that ratio to taxpayers? Do you calculate that ratio in advance, or how does that work? We do not calculate it in advance, Your Honor. That information is available, however. Mr. Goodwin is correct that we don't rely on sales ratio studies anymore, or to the extent we did. But that information, nevertheless, is available. If you don't rely on it, then why should the statute apply? Your Honor, CSX Railroad has the burden of proof. B1 applies here. They have it. You just told me that you don't rely on the ratio. Your Honor, what I would point, what I would respectfully point out to the Court, that the information to determine the assessed value of non-railroad property versus its fair market value versus the assessed value of railroad property over its fair market value, that information is available. But we would further point out that. No, I understand that, but then your subsequent statement was that you don't rely on that information. So how in the world can that be relevant to this case? They can certainly, CSX Railroad can find the information. It doesn't matter where they can find it. If you don't rely on it to impose the tax, why does it matter? But your Honor, what Congress has mandated with what were required under subsection C is that there be that ratio study. Excuse me. When I say, and the ratio study in itself, sales ratio study is different from just the difference in assessed and equalization, the assessed values, excuse me. The information to determine subsection C is available. The state might not produce sales ratio studies, but we don't have the burden of proof. CSX Railroad does. And we would further point out that subsection C says that where there's some difficulty in proving what's necessary in the subsection C, there's an alternative method for railroads to use. Here there was a complete failure of proof. Not only did CSX Railroad not try to show the required 5% disparity under any normal study, they could have produced their own sales ratio studies. They could have brought in an expert to testify as to some statistical analysis. They failed on the issue of proof, and they also failed to even rely upon the alternative method. I would point out to the court that there's a district, the district court opinion in Ogilvie, and this is the, cited in the CSX brief, 492F446, the district court essentially says, yes, sales ratio studies might be the gold standard, but there are other ways of proving subsection C. That's not the only way. Here CSX Railroad completely failed to do anything under B1. What they said is that our case should be brought forward under subsection B4. The district court disagreed. They failed to show their case. We would further point out to this court respectfully, and they've argued a number of things. They've argued somehow that the district court's conclusion in the state's case somehow undermines ACF versus Oregon. As you're aware, ACF versus Oregon, the Supreme Court essentially says that exemption statutes, tax exemption statutes, can be offered to non-railroad property without being offered to railroad property and not be in violation of the 4R Act, except where there is that finding that there's been targeting of railroads. The district court here made no finding of targeting railroads, but even so, let's look at the effect of the statute. What does this statute do? This statute suppresses that assessed value of non-railroad property versus its market value. All of this information is available. So the statute still results in discrimination that can be analyzed in the subsection one. You've also got to think about how ACF came about and how the Supreme Court carved out this exception. In ACF, we were talking about property tax exemptions. They cannot be analyzed under B1, 2, and 3. Therefore, the singling out and targeting rationale is the only way to give the railroads any relief. Let's assume we disagree with you with respect to the B1 argument and find that this is a B4 tax. What's your position on whether or not the taxpayer in this case has made out a prima facie case? Have they shown a prima facie case of discrimination? Are they being treated differently if we assume this is a B4 tax? Your Honor, there's no question that they are being denied a benefit. We do not agree, however, with their latest assertion that the proper comparison class is other industrial. I'm not sure what he said. I think he may have just said other industrial taxpayers is what he said, I think. During trial, we showed that there were a number of differences between railroad property and non-railroad property, certainly other commercial industrial property, but the subset of other commercial industrial property needs to be defined even further. In the 2015 U.S. Supreme Court case, CSX versus Alabama, comparison class has to be similarly situated to the railroads. We presented abundant evidence at trial to show that railroad property and other commercial industrial property in and of itself, there are differences there. And furthermore, Your Honor, in a B4 case now with the 2015 Supreme Court case, there has to be an evaluation of the justifications that the state has put forward. The district court did not make those findings because, of course, it found, and, of course, the state of South Carolina continues to maintain that the proper subsection is B1. Your Honors, I see I have a few minutes left. I would like to address the Bayer case, of course, the circuit court opinion in Bayer. Bayer was classification discrimination. Couldn't address it under B1, B2, or B3, and therefore had to be addressed under B4. Now, in one of their briefs, they say, well, I don't know how the Department of Revenue got there. We cited the language of the circuit court itself, saying that this is classification discrimination. What you've got to remember about Bayer is that essentially the state allowed certain exemptions to personal property, but they classified all railroad property, whether it was personal, real, intangible, they classified all of it as real property so that the rollbacks at issue in Bayer never could apply to railroads because they didn't have personal property. We would submit to this court that had railroad personal property been recognized such that the only issue would be, we deny, although you've got personal property, we deny you the rollback, that would have been the B1 case that this is, such that the proper analysis would have been in the subsection B1. Your Honors, if there are no further questions. Let me ask you this. Yes, sir. Mr. Kempson, this is a different type than what you've argued, but one of the things that bothers me about this is the district court said, well, you proceeded under the wrong subsection. And it seems to me implicit in that is, well, if you'd gone under B1, you'd have won. But even though you would have won under B1 since you went before, you're out of court, you lose. Even though there is a valid claim being made by you under one of these subsections, because I think it ought to be here instead of here, you lose. Not that I'm gonna go now analyze it under B1, see if it is indeed valid, you lose. You're out of court. And that seems mighty odd to me. This was a fully contested case. You're trying to achieve justice. If you're trying to achieve justice. I understand, Your Honor. This was a fully contested case. Evidence on both sides. CSX had its opportunity to present evidence under B1. It didn't give the district court anything to make a decision under B1. They completely failed. Had they been put on notice by the district court that this was a B1 case? Yeah, Your Honor, thank you for that question. We filed a motion to dismiss after the pleadings had been closed. Essentially arguing that this was not a B4 case, that this case needed to be analyzed under another prong for our act. The district court heard our arguments and in an oral ruling said, essentially Department of Revenue, I understand what you're saying, that they've alleged solely B4, but because in the body of their pleadings they've alleged the entire four-hour act, I'm going to deny your motion to dismiss. We would argue certainly that's clear notice that you needed to present other evidence under one of the other prongs. So, Your Honor, we would argue that yes, sir, they had been put on notice that B4 may be problematic and that they certainly had their opportunity to present evidence under B1. So, your position is they just decided to roll the dice on B4? Yes, Your Honor. Put all their marbles on B4. Put all their marbles on B4. And we've tried to figure out why. We've tried to figure out why. We would submit to this court that allowing CSX Railroad to go under B4 here is an expansion of the four-hour act beyond that which is intended by Congress. Congress gave us B1, B2, and B3. Congress also said if you prove your case under, if you go under B1, you've got certain proof requirements. If we were to allow CSX Railroad here to simply bypass B1, again, the state believes this is the section it should have been evaluating, what do we essentially do? We allow, we essentially declare B1 to be superfluous. Now, there are going to be some subsection of cases as Mr. Guvinas says, oh, it's the classic B1 case. But the effect of this statute is to do exactly what B1 was designed to prevent. So if we allow them to just jump to B4, we've declared B1 meaningless. B1 is much harder to prove than B4, although with the latest Supreme Court decision, they've certainly got to put forward a valid comparison class similarly situated. They've certainly got to evaluate the justifications. But if we allow them to go forward and bypass B4, essentially they are also allowing them to bypass what B1 was there, and was put there for, and allowing them to bypass the stringent proof requirements of B1. The Department of Revenue would respectfully request that the district court's opinion be affirmed that the preliminary or the request for adjunctive relief that CSX has made be denied. Thank you. Thank you, Mr. Kempson. Mr. Goodwin, reply. The record in this case shows that while other commercial industrial real property owners in California and South Carolina are having their values increases cap at 15%, while CSXT's goes up 51%. If that doesn't show inequality of treatment, I don't know what does. And as far as the CSX-1, these sales tax cases, change the law, change the 40 years of precedent on property tax cases, I hate to waste my five minutes on this, but it's very important, because the sand that the DOR is building its house on is the language of Justice Kagan in CSX-1, sales tax case, where she in fact expanded what B4 covers. Because the states were arguing, you know, B4 doesn't cover this kind of tax. And she says it covers any kind of tax. Another tax is used in B4, is best understood to refer to all of these, all these kinds of taxes. And precisely to encompass any form of tax a state might impose on any asset or transaction, except the taxes on property previously addressed in B1 through B3. The district court and Mr. Kempton said, ah, you got to go into B1 now. Remember the context of that case, ACF had held in 1994, and a challenge by car lines who provide their cars to the railroads, they're covered by the act, that Oregon had decided to exempt certain categories of its business and personal property tax rates. And therefore, the car lines argued, we should get that relief. What the court did in their analysis said, well, we've looked at the whole statute, and we see that Congress, by defining the comparison property as property subject to a tax levy, decided to allow the states to have some exemptions. That's what she means about property previously addressed in subsections B1 and B3. In other words, you can't use B4 to kill a tax that Congress has said is okay under otherwise in the act. And that's the context of that. She wasn't talking at all about property taxes. CSX is not property tax cases. They're sales tax cases. But the 11th Circuit had held, we're going to apply ACF to sales tax. And that's what CSX1 was about. Said, no, you don't, because now you're under B4. And just because we said in property taxes, because of the definition of property, which does not appear in B4, then we're not going to apply ACF to sales tax cases. That's what those cases were about. As far as- In response to Judge Traxler's question earlier about the sort of fairness question about the district court, why didn't the district court just go ahead and analyze the evidence under the correct section, opposing counsel said there wasn't anything there. You didn't submit sufficient proof under the correct section for the district court to have done that analysis. What's your position on that? Would we have to send it back to start all over and let you try again? Or is there enough there? Well, Judge Thacker, we didn't submit that, because number one, we didn't. Did not? We did not, because we didn't have to. Under B4, you don't have to do that. This is a tax- Well, it's not a matter of choosing, Judge. That's the one that was applicable. That's the one that's applicable to this case, based on the precedents going back to 1982. And let me, Judge Thacker, look- But assuming we find B1 is applicable as the district court did, is there anything in the record to support your position under B1? Well, we've already put into the record the difficulty, if not impracticality, of showing the level of assessment, given the cap and given the way the classification statute works. But I will say to the court that if the court decides that, well, B4 simply does not apply, and you've got to have B1, we now have Mr. Kempson saying, well, they've got all this evidence to show what the levels of assessment are. Then I would prefer a remand to an affirmance. But I don't think that's the answer. This is a lot like Clinchfield. Remember what happened in Clinchfield. The railroads proved that they were being vastly discriminated against in real profit. And they went on to say, therefore, we could assume we're getting the same bad job on personal profit. And the state said, well, wait a minute. You can't do that. Where's your proof on that? And this court held, quite correctly so, look, when we see a suspicious tax, we're going to remedy it. State, if you think you've got better proof, if you think you've got better proof on personal property, bring it in. But you didn't. And that's exactly what Mr. Kempson is arguing here. As far as the 5% disparity, as we put in our brief, the Supreme Court has held that doesn't apply to B4 cases. And- I see your time is up, but I do want to ask a question, because I think maybe the more you hear it, the better it's easily understood, particularly in these tax cases. You had made a comment during your initial argument about these ratios and how the state doesn't rely on them. What did you mean by that? Well, the classic way to show that the assessed value to fair market value of railroads is different than for other commercial industrial tax payers is to use a sales ratio study, which takes sold properties, compares them to the assessed value, and says, well, the average taxpayer out there is paying on 80% of the value of the sales. And use sales ratio studies to do that. As the Department of Revenue recognizes, sales ratio studies won't work anymore, because the premise is everybody's on the same homogeneous level of fair market value. And once you abandon that, that South Carolina, and you know, South Carolina has the right to abandon that if they want to, but you make the sales ratio study an out. So is it your position that the state is requiring you to engage in an analysis that it itself has abandoned? That's correct. That's, and that's why this is not a 1A case. It's just not a 1A case for that basis. It is a singly out of railroads. And if I've got, can make one last comment. Mr. Kinson said that the district court made no finding that this is singling out. Well, the statute singles it out. And targeting, in this instance, is like targeting in football. I don't have to prove that the defense is back, meant to hit the wide receiver in the helmet. If he does, it's targeted. Thank you, Your Honor. Thank you, Mr. Goodman. All right, we'll come down and re-counsel after the court has been adjourned.
judges: William B. Traxler, Jr., Albert Diaz, Stephanie D. Thacker